**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 18-20094-01-DDC** |
| **DERON O. DYE,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

In June 2018, a man sprinting away from two Kansas City, Kansas police officers dropped a firearm in the street.  Police recovered the gun.  This case asks whether that evidence is admissible against the man.  Defendant Deron O. Dye has filed a Renewed Motion to Suppress Evidence (Doc. 78) and Memorandum in Support (Doc. 79).  The court held an evidentiary hearing on the motion.  *See* Doc. 84.  The government then filed a Response (Doc. 86).  And Mr. Dye filed a second brief (Doc. 87).  For reasons explained below, the court grants Mr. Dye's motion.

But before evaluating Mr. Dye's request to supress evidence based on an alleged Fourth Amendment violation, the court reviews the case's complex procedural history.

## I.      Procedural Background

The zigzag of Mr. Dye's case through the federal courts includes a brief trip to the Circuit and back, and two suppression hearings before two different district court judges.  On December 4, 2018, a grand jury returned an Indictment charging Mr. Dye with one count of possessing a firearm and ammunition as a convicted felon.  *See* Doc. 1 at 1.  On July 29, 2019, Mr. Dye filed

a Motion to Supress Evidence (Doc. 13).  Soon after, our court held an evidentiary hearing, Doc. 19, and ultimately denied the request to suppress evidence of the firearm, *see* Doc. 21 (Murguia, J., denying defendant's Motion to Suppress).

Mr. Dye aimed to appeal that ruling, but then waived his right to a jury trial and elected a stipulated bench trial.  Doc. 25 at 1; *see also* Doc. 28 at 2.  And our court held a bench trial based on stipulated facts.  Doc. 28 at 1–2.  The court found Mr. Dye guilty of Count 1 of the Indictment:  Possessing a firearm as a felon under 18 U.S.C. §§ 922(g)(1), 924(a)(2).  *Id.*; Doc. 46 at 1.  The court later sentenced Mr. Dye to 37 months' imprisonment and three years of supervised release.  Doc. 46 at 2–3.  The court ordered the sentence to run consecutively to a 10-month prison sentence imposed in revocation case 11-CR-20024-002.  *Id.* at 2.

Mr. Dye timely appealed.  Doc. 48 at 1.  But the parties later filed a Joint Motion to Remand.  *See* Doc. 62.  The parties asserted that the case deserved remand under *United States v. Livingston*, 586 F.3d 819 (10th Cir. 2009) because Mr. Dye may have stipulated to facts for purposes of the bench trial without knowledge that those stipulated facts would moot his later appeal of the district court's suppression ruling.  *See* Joint Motion for Remand at 2–3 (¶¶ 4–5), *United States v. Dye*, No. 20-3181 (10th Cir. Jan. 11, 2021).  The Court of Appeals granted the motion and remanded the case to the district court to conduct an evidentiary hearing under *Livingston*.  Doc. 62.

Mr. Dye filed an Unopposed Motion to Withdraw Stipulations (Doc. 67) asserting that the court should strike the stipulations used to convict him at the bench trial because Mr. Dye did not knowingly and voluntarily enter into those stipulations.  Doc. 67 at 4.  The court granted that motion.  Doc. 68.  Defendant then moved the court to vacate the December 16, 2019 bench trial guilty verdict because it was based on defendant's now-withdrawn stipulations.  *Id.*  On March 3,

2021, the court granted the motion to vacate the bench trial guilty verdict. *Id.* And given the court's ruling vacating the guilty verdict, the court vacated the Judgment (Doc. 46) filed on August 28, 2020. Doc. 70.

Next, Mr. Dye filed a Motion to Reopen Suppression Proceedings (Doc. 69). He offered "three evidence-related reasons to reopen the suppression proceedings." Doc. 69 at 6. This triad included newly discovered video footage of the events at issue, some of which Mr. Dye asserted "directly contradicts the police officers' testimony in numerous respects." *Id.* The court granted the Motion to Reopen Suppression Proceedings. *See* Doc. 74. The court invited renewed briefing on the suppression issue. *Id.* at 2. Mr. Dye filed the pending Renewed Motion to Suppress Evidence (Doc. 78). And the court held an evidentiary hearing on April 20, 2021. Doc. 84. The parties then filed additional briefs. *See* Doc. 86; Doc. 87.

Before turning to the briefs, the court makes the following findings of facts.

## II.    Findings of Fact[1]

On June 12, 2018, Bus 132 was stopped at a bus station in Kansas City, Kansas. Def. Ex. 5. As riders hopped on the bus and paid their fares, a passenger with a lunchbox stood near the front of the parked bus, talking to the driver. *Id.* The two men looked out the front windshield and chatted about someone at the bus station. *Id.* The passenger commented on the foolishness of the fellow at the bus station using marijuana. *Id.* The bus driver surprised the passenger by informing him that the man also had a gun on him. *Id.* The bus driver explained to the passenger that he had seen the gun on the man. *Id.*

---

[1]     On April 20, 2021, the court held an evidentiary hearing on defendant's Renewed Motion to Suppress Evidence. *See* Doc. 84. During the hearing, the government called three witnesses. *See* Doc. 84-1 at 1. And both parties moved the court to admit into evidence various pieces of evidence. *See* Doc. 84-2 at 1–2 (Ex. Sheet listing gov't's exhibits); Doc. 84-3 at 1 (Ex. Sheet listing Def.'s exhibits).

The passenger then grabbed his lunchbox, stepped off of the bus, and walked over to a nearby police station. *Id.* Captain Magee of the Kansas City, Kansas Police Department was speaking to his father in the police station parking lot when the passenger approached. Gov't Ex. 4. The passenger reported to Captain Magee that there was a man at the bus stop with a gun, smoking marijuana. Def. Ex. 1 at 6–7 (First Suppression Hr'g Tr. 6:17–7:2). Captain Magee testified that the tipster "said [the man at the bus stop] was wearing a t-shirt, shorts, and had a backpack and had dread lock type hair." *Id.* at 7; *see also id.* at 22–24, 28–29. The man in question sat within Captain Magee's vantage as he listened to the informant's tip. *Id.* at 22–25 (22:18–25:1) (describing the exchange of information about the suspect's appearance). And Captain Magee then asked the informant questions seeking to confirm that the man in sight was the person the tipster had described. *See id.* at 27–29 (27:25–29:25); *see also id.* at 22–25 (22:18–25:1); Gov't Ex. 4. The informant didn't stick around long, his conversation with Captain Magee lasted about 20 seconds. *See* Gov't Ex. 4. Captain Magee testified that the informant "just wanted to point it out and leave[.]" Def. Ex. 1 at 40 (First Suppression Hr'g Tr. 40:1–2).

After the informant walked away, Captain Magee entered the police station to inform another officer—Sergeant Bruce—about the tip. *Id.* at 32 (First Suppression Hr'g Tr. 32:4–15). The two officers soon walked over to the bus stop to investigate the tip. Gov't Ex. 1. As they approached the bus stop, Bus 176 was rolling in and it stopped in front of the bus shelter. Def. Ex. 4. A line of riders began to stream off the bus as the officers approached the bus shelter. *Id.* In the shelter, someone sat on a bench facing the bus. Gov't Ex. 13. The seated person was Mr. Dye—a Black man who was wearing shorts, a t-shirt, and a backpack. Gov't Ex. 1. During the hearing, the officers explained that they split up to approach the seated suspect from either side

of the bus shelter.  Sergeant Bruce testified that he did not (1) see anything in Mr. Dye's hands, (2) see or smell him smoking anything, or (3) see a gun.

Sergeant Bruce ordered Mr. Dye to show his hands or put them up.  *See* Def. Ex. 1 at 52 (First Suppression Hr'g Tr. 52:4–11).  And Mr. Dye complied, raising his arms up from his lap and showing his hands to Sergeant Bruce.  *See* Def. Ex. 3.  Moments later, Mr. Dye made a run for it.  *Id.*  But he immediately collided with Captain Magee—who was standing just behind Mr. Dye and had begun swinging his baton at Mr. Dye as soon as Mr. Dye launched his escape attempt.  *Id.*  Captain Magee struck Mr. Dye with the baton, but Mr. Dye sprinted off—passing in front of parked Bus 176 and then off toward the horizon.  Gov't Ex. 14.  Just after passing by the nose of Bus 176, Mr. Dye dropped a gun and lost at least one sandal.  Def. Ex. 6.  Captain Magee pursued Mr. Dye on foot as Sergeant Bruce abandoned the chase, stopping to secure the firearm.  *Id.*; Gov't Ex. 13.  Mr. Dye avoided arrest that day, but the law later caught up with him.  Our court would ultimately sentence him to 37 months in federal prison for possessing a firearm after his conviction of a felony.  *See* Doc. 46 at 2 (vacated).  But, as the court explained when reviewing this case's rich procedural history, this story is ongoing.

Next, the court reviews the legal principals governing Mr. Dye's request to suppress evidence based on the evidence's purportedly unconstitutional origins.

## III.    Legal Standard

Mr. Dye's suppression motion invokes his rights under the Fourth Amendment to the United States Constitution.  Doc. 78 at 1.  It provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  The seizure of a person can play out in one of two ways.  *First*, it "can take the form of 'physical force[.]'"  *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).  Or, *second*, seizure of a person can take the form of "a 'show of authority' that 'in some way restrain[s] the liberty' of the person."  *Id.* (quoting *Terry*, 392 U.S. at 19 n.16).  The "application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued."  *Id.* at 1003.  "Unlike a seizure by force, a seizure by acquisition of control involves either voluntary submission to a show of authority or the termination of freedom of movement."  *Id.* at 1001.

But, the "Fourth Amendment does not forbid all or even most seizures—only unreasonable ones."  *Id.* at 1003.  If a court determines a search or seizure violated the Constitution, the exclusionary rule prohibits the court from admitting into evidence the fruits of all evidence seized illegally (unless an exception applies).  *See Wong Sun v. United States*, 371 U.S. 471, 485–88 (1963).

The court now applies these Fourth Amendment principles to the facts of Mr. Dye's case.

## IV.   Discussion

This case stems from Mr. Dye's encounter with two police officers at a bus stop in Kansas City, Kansas.  Mr. Dye's Motion to Supress identifies two potential seizures of Mr. Dye: One seizure by Sergeant Bruce, and a second seizure by Captain Magee.  The court analyzes Mr. Dye's encounter with each law enforcement officer individually.  The court considers the full encounter in chronological order, beginning with Sergeant Bruce's interaction with Mr. Dye.

### A.   Whether Sergeant Bruce Violated Mr. Dye's Fourth Amendment Rights

#### 1.   Whether Sergeant Bruce Seized Mr. Dye for Purposes of the Fourth Amendment

The parties dispute whether Sergeant Bruce's interaction with Mr. Dye constituted a seizure (by show of authority) under the Fourth Amendment.  Mr. Dye asserts that it did.  *See* Doc. 79 at 3–5.  The government disagrees.  *See* Doc. 86 at 9–10.  The court now briefly reviews the law governing show of authority seizures and then determines whether one occurred here.

##### a.   Law Governing Show of Authority Seizures

"[C]ommon law arrests are Fourth Amendment seizures."  *Torres*, 141 S. Ct. at 995. "The common law distinguished the application of force from a show of authority, such as an order for a suspect to halt."  *Id.*  A show of authority "does not become an arrest unless and until the arrestee complies with the demand."  *Id.*; *see also California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("An arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority."); *United States v. Roberson*, 864 F.3d 1118, 1121 (10th Cir. 2017) ("A show of authority alone is not a seizure without actual submission." (citation and internal quotation marks omitted)).

"The proper inquiry 'is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'"  *United States v. Drayton*, 536 U.S. 194, 202 (2002) (*Florida* v. *Bostick*, 501 U.S. 429, 436 (1991)).  "Actual submission depends on the view of a reasonable law enforcement officer under the totality of the circumstances." *Roberson*, 864 F.3d at 1122 (citation and internal quotation marks omitted).  "Because the standard is an objective one," our Circuit considers "whether a citizen has submitted to authority by examining the view of a reasonable law enforcement officer under the circumstances." *Salazar*, 609 F.3d at 1065.

It is "the nature of the interaction, and not its length, that matters." *United States v. Salazar*, 609 F.3d 1059, 1065 (10th Cir. 2010) (citation and internal quotation marks omitted). "Submission requires, at minimum, that a suspect manifest compliance with police orders." *Roberson*, 864 F.3d at 1122 (citation and internal quotation marks omitted). Yet, our Circuit has "indicated . . . that a momentary pause is not submission." *Farrell v. Montoya*, 878 F.3d 933, 938 (10th Cir. 2017). "But what may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Brendlin v. Cal.*, 551 U.S. 249, 262 (2007).

### b. Whether Sergeant Bruce Seized Mr. Dye

Here, Sergeant Bruce approached the bus stop shelter where Mr. Dye sat upon a bench. With his hand on his holstered firearm, Sergeant Bruce approached Mr. Dye and verbally ordered him to raise his hands or let the officer see his hands. *See* Def. Ex. 1 at 52 (First Suppression Hr'g Tr. 52:4–8) ("I said, show me your hands, put your hands up, something to that effect[.]"); *see also* Def. Ex. 1 at 61–62 (First Suppression Hr'g Tr. 61:4–62:16). There's little dispute that this was a show of authority. *See, e.g.*, Doc. 86 at 10. But the parties disagree whether Mr. Dye submitted to it. Mr. Dye responded to Sergeant Bruce's show of authority by moving his arms. The parties assign different meanings to the arm movement. Mr. Dye asserts that he "obeyed the officer's commands" to "put his hands in the air[.]" Doc. 87 at 4. In contrast, the government contends that he "did not comply with Bruce's command to show his hands." Doc. 86 at 10.

The parties' descriptions of the event diverge despite video evidence capturing the interaction. The footage shows Mr. Dye seated, then raising his arms. At the April 20, 2021

evidentiary hearing, Sergeant Bruce testified that photo evidence (screenshots taken from the video footage) shows that Mr. Dye raised his hands from his lap.  The government asserts that Mr. Dye "did not actually submit to" Sergeant Bruce's show of authority because Mr. Dye "did not comply with Bruce's command to show his hands."  Doc. 86 at 10.

This assertion is difficult to reconcile with the video footage.  Sergeant Bruce ordered Mr. Dye to show his hands or put them up.  *See* Def. Ex. 1 at 52 (First Suppression Hr'g Tr. 52:4–8).  And Mr. Dye complied by raising his arms and showing his hands.  *See* Def. Ex. 3. The United States argues that Mr. Dye "did not submit to Sergeant Bruce's show of authority by briefly raising his hands and then immediately running."  Doc. 86 at 10.  The government emphasizes the brevity of the encounter and implies that the hand raising was too brief to constitute a submission.  *Id.* at 9–10.  But it is "the nature of the interaction, and not its length, that matters."  *Salazar*, 609 F.3d at 1065 (citation and internal quotation marks omitted).  And our Circuit has evaluated a momentary reaction to a show of authority in terms of whether a reasonable officer would have viewed the defendant's brief response as a submission to authority.  *See Roberson*, 864 F.3d at 1123 & n.8.

Mr. Dye did not merely *pause* in response to Sergeant Bruce's show of authority. Instead, he manifested compliance with a uniformed police officer's verbal order to show his hands.  Mr. Dye's responsive movement differs from the conduct in cases holding that a defendant's brief pause was not submission to the given show of authority.  *See Roberson*, 864 F.3d at 1123 & n.8 (discussing "fleeting pause" cases); *Farrell*, 878 F.3d at 938 (rejecting defendants' argument that they submitted to showing of authority when they "momentarily halted" when a law enforcement officer pointed his gun at their vehicle).  When a suspect raises his hands when ordered to do so, he does more than a halt or pause for a moment—even if he

flees soon after. *See United States v. Hudson*, No. 5:18-CR-40036-HLT, 2019 WL 572653, at *3 & n.3 (D. Kan. Feb. 12, 2019) (distinguishing brief submissions from pauses and actions "done to facilitate flight" that do not "demonstrate capitulation"). To move one's limbs as directed by another's verbal command is an affirmative responsive movement.

In another case involving a defendant's hand movements responding to an officer's command, the D.C. Circuit held that the short duration of defendant's submission to an officer's show of authority "means only that the seizure was brief, not that no seizure occurred." *United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014). In *Brodie*, the government conceded that "police made a show of authority when they ordered [defendant] to put his hands on the car" but claimed defendant "didn't submit, arguing that the compliance was too 'momentary' to constitute submission." *Id.* Defendant asserted that "he submitted by putting his hands on the car, and that therefore he was seized for the brief period between compliance and flight." *Id.*

*Brodie* concluded that defendant had submitted to the show of authority and explained that "[l]ater acts of noncompliance do not negate a defendant's initial submission, so long as it was authentic." *Id.* The D.C. Circuit saw "no basis for classifying [defendant's] action—putting his hands on the car when told to do so by the police—as anything other than full compliance with the officer's request." *Id. Brodie* noted the lack of reason to think defendant's compliance "was feigned" or that he "had some ulterior purpose in putting his hands on the car, such as a belief that doing so would facilitate escape." *Id.* Here, the facts provide no reason to think that defendant moving his hands in compliance with the specific verbal order of an officer approaching with his hand on his holstered firearm was a strategic feigning or other ruse to facilitate escape. *See id.*

Mr. Dye's affirmative act of compliance was short lived, but still, it was compliance with the officer's command.  When the approaching police officer with his hand on his holstered firearm verbally ordered Mr. Dye to raise or show his hands, Mr. Dye raised and showed his hands.  A reasonable officer would have viewed that reaction as submitting to a showing of police authority.  Thus, Sergeant Bruce seized Mr. Dye for purposes of the Fourth Amendment.

The court next considers whether Sergeant Bruce's seizure of Mr. Dye was unreasonable.

### 2.   Whether Sergeant Bruce's Seizure of Mr. Dye Was Unreasonable

The parties also disagree whether Sergeant Bruce seizing Mr. Dye was unreasonable under the Fourth Amendment.  Standing in the spotlight at center stage of this dispute is a tip that Captain Magee received from an unnamed person who ventured to the police station parking lot with a tale to tell.  The government asserts that the "police officers had reasonable suspicion to detain the defendant from the inception of the encounter based on the reliability of the Tipster's in-person report and the officers' observations."  Doc. 86 at 4.  But Mr. Dye argues that (1) the "tipster's information was insufficient to amount to reasonable suspicion[,]" and (2) Sergeant Bruce failed to corroborate the tipster's information.  Doc. 87 at 5, 9–12.

The court now recites the law governing reasonable suspicion justifying investigatory stops under the Fourth Amendment.  Then, the court applies that standard to Sergeant Bruce's interaction with Mr. Dye.

### a.   Law Governing Investigative Stops Under the Fourth Amendment

The Fourth Amendment protects persons from unreasonable searches and seizures.  U.S. Const. amend. IV.  "An investigative, non-consensual detention constitutes a seizure under the Fourth Amendment."  *United States v. Briggs*, 720 F.3d 1281, 1284 (10th Cir. 2013) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  In *Terry*, the Supreme Court established the

principle that a law enforcement officer "'may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to arrest.'"  *United States v. Treto-Haro*, 287 F.3d 1000, 1004 (10th Cir. 2002) (quoting *Terry*, 392 U.S. at 22).  Under *Terry*, an investigatory detention is reasonable and, hence, constitutional if it is:  (1) "justified at its inception" and (2) "reasonably related in scope to the circumstances which justified the interference in the first place."  *Terry*, 392 U.S. at 20.

An investigatory detention is justified at its inception if "specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime."  *United States v. Werking*, 915 F.2d 1404, 1407 (10th Cir. 1990).  But reasonable suspicion "must be more than an 'inchoate and unparticularized suspicion or hunch.'"  *Donahue v. Wihongi*, 948 F.3d 1177, 1188 (10th Cir. 2020) (quoting *Alabama v. White*, 496 U.S. 325, 329 (1990)).  "Nevertheless, the level of suspicion required for reasonable suspicion is considerably less than proof by a preponderance of the evidence or that required for probable cause."  *Briggs*, 720 F.3d at 1285 (citations and internal quotation marks omitted).  "The detaining officer needs only to articulate 'some minimal level of objective justification' for the detention."  *Id.* (quoting *Sokolow*, 490 U.S. at 7).  "'A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct.'"  *Donahue*, 948 F.3d at 1188 (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)).  And reasonable suspicion "may exist even if it is more likely than not that the individual is not involved in any illegality."  *Id.* (citation and internal quotation marks omitted).

When determining whether reasonable suspicion exists, the court looks to the "'totality of the circumstances' known to the detaining officer 'rather than assessing each factor or piece of

evidence in isolation.'" *Briggs*, 720 F.3d at 1285 (quoting *United States v. McHugh*, 639 F.3d 1250, 1256 (10th Cir. 2011)).  "The determination 'must be based on commonsense judgments and inferences about human behavior.'" *Donahue*, 948 F.3d at 1188 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).  The court "also must 'defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions.'" *Briggs*, 720 F.3d at 1285 (quoting *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001)).  The court employs an objective analysis, asking "whether the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate." *Id.* (citations and internal quotation marks omitted).

### i.   Law Governing Reasonable Suspicion Arising from an Informant's Tip

"The Supreme Court has struck a delicate balance on when an anonymous tip can provide a reasonable suspicion for an investigatory stop." *United States v. Gaines*, ___ F. App'x ___, No. 19-3177, 2021 WL 2105071, at *3 (10th Cir. May 25, 2021).  Reasonable suspicion "may arise from information provided by individuals." *Donahue*, 948 F.3d at 1189.  But an "anonymous tip alone without 'indicia of reliability' is not enough." *Id.* (quoting *Florida v. J.L.*, 529 U.S. 266, 270 (2000)).  Our Circuit has discussed various factors governing the reliability of an anonymous tip.  The "relevant factors" include:

> (1) whether the informant lacked 'true anonymity' (i.e., whether the police knew some details about the informant or had means to discover them); (2) whether the informant reported contemporaneous, firsthand knowledge; (3) whether the informant provided detailed information about the events observed; (4) the informant's stated motivation for reporting the information; and (5) whether the police were able to corroborate information provided by the informant.

*United States v. Chavez*, 660 F.3d 1215, 1222 (10th Cir. 2011); *see also Donahue*, 948 F.3d at 1189 ("Relevant considerations include whether the officers corroborated details of the tip, such

as the informant's 'basis of knowledge' and 'veracity.'" (quoting *Illinois v. Gates*, 462 U.S. 213, 241 (1983))).  An informant's eyewitness knowledge also "'lends significant support to the tip's reliability.'"  *Id.* (quoting *Navarette v. Cal.*, 572 U.S. 393, 399 (2014)).

When considering whether the informant offers predictive information that law enforcement can corroborate, the Supreme Court has noted the value of "corroborated details related 'not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted.'"  *Gaines*, 2021 WL 2105071, at *4 (quoting *White*, 496 U.S. at 332).  "If a tipster can accurately predict an individual's future behavior, it implies that the tipster has 'a special familiarity with [the individual's] affairs' and, in particular, 'access to reliable information about that individual's illegal activity.'"  *Id.* (quoting *White*, 496 U.S. at 332).  "But if a tip 'provide[s] no predictive information and therefore le[aves] the police without means to test the informant's knowledge or credibility,' it will often not justify an investigatory stop."  *Id.* (quoting *J.L.*, 529 U.S. at 271).  Though courts "place a premium on information related 'to future actions of third parties [which are] ordinarily not easily predicted,' such details are not necessarily required to render an anonymous tip reliable." *Id.* at *5 (quoting *United States v. Hauk*, 412 F.3d 1179, 1189 (10th Cir. 2005)); *see also Navarette*, 572 U.S. at 404 (holding in "a close case" that despite absence of predictive information, nameless driver's 911 call bore sufficient indicia of reliability to provide police officer with reasonable suspicion that the driver of the reported vehicle had run another vehicle off the road (citation and internal quotation marks omitted)).

"Face-to-face informants generally are more reliable than anonymous informants because they allow[ ] the police an opportunity to evaluate [their] credibility and demeanor."  *Donahue*, 948 F.3d at 1189 (citation and internal quotation marks omitted).  "Courts may also apply less

skepticism and careful scrutiny to the reliability of an identified victim or ordinary citizen witness than the often-anonymous informant who supplies information on a regular basis." *Id.* (citation and internal quotation marks omitted).

The court now applies these principles to the bus passenger's tip to Captain Magee, and Sergeant Bruce's seizure of Mr. Dye to assess whether the seizure met the Fourth Amendment's requirements.

### 3. Whether Sergeant Bruce's Investigatory Detention of Mr. Dye was Justified at its Inception

The government asserts that Sergeant Bruce "had reasonable suspicion to detain the defendant from the inception of the encounter based on the reliability of the Tipster's in-person report and the officers' observations." Doc. 86 at 4. In contrast, Mr. Dye argues that (1) the "tipster's information was insufficient to amount to reasonable suspicion[,]" and (2) Sergeant Bruce failed to corroborate the tipster's information. Doc. 87 at 5, 9–12. First, the court considers the tipster and the information he shared with the police. Then, the court considers whether the officers' observations or corroboration contributed to Sergeant Bruce's conclusion that reasonable suspicion existed.

A tipster walked up to Captain Magee to share some information about a man at the bus stop. Captain Magee testified previously that the tipster mentioned that a man sitting on a bench at the bus stop was smoking marijuana and possessing a gun. Def. Ex. 1 at 6–7 (First Suppression Hr'g Tr. 6:22–7:2). Captain Magee also testified that the tipster "said [the man at the bus stop] was wearing a t-shirt, shorts, and had a backpack and had dread lock type hair." *Id.* at 7 (7:3–6); *see also id.* at 22–25 (22:18–25:1) (describing the exchange of information about the suspect's appearance). But Captain Magee explained that, rather than affirmatively reporting or describing details about the suspect, the informant merely confirmed Captain Magee's own

description of the person at the bus stop visible to the two men as they chatted.  S*ee id.* at 27–29 (27:25–29:25); *see also id.* at 22–25 (22:18–25:1); Gov't Ex. 4.

It remains muddled whether the tipster disclosed how he knew about the marijuana or gun.  The record and briefs are inconsistent about both the basis of the informant's knowledge of Mr. Dye, and what he told Captain Magee.  Video evidence suggests that the informant believed someone at the bus stop was using marijuana.  Def. Ex. 5 (capturing informant's chat with bus driver).  But that belief's basis remains unknown.  The video evidence does not suggest that the informant observed anyone possessing a gun.  Rather, the bus camera captured the conversation between the informant and the bus driver suggesting that the informant learned of the gun from the bus driver, and not from his own observations.  *See* Def. Ex. 5 (capturing bus driver informing passenger-tipster that a person had a gun).

Yet Captain Magee testified previously that the informant reported to him both (1) that the suspect at the bus stop had a gun, and (2) that the informant had *observed* a gun.  *See* Def. Ex. 1 at 21–22 (First Suppression H'rg Tr. 21:16–22:3).  The government now suggests that the informant's tip was based on someone else's observations.  *See, e.g.*, Doc. 86 at 4 (noting that "it appears the Tipster was reporting observations made by the bus driver of Bus 132"); Doc. 86 at 6 ("Even though the information the Tipster relayed to Magee was arguably hearsay . . . ."); Doc. 86 at 7 ("Magee appears not to have known the Tipster's report was arguably hearsay[.]").  The government's arguments imply that either (1) the informant did not disclose the basis of knowledge about the suspect's criminal conduct (contrary to Captain Magee's testimony, Def. Ex. 1 at 21–22 (21:16–22:3)), or (2) the informant lied to Captain Magee about the basis of knowledge about Mr. Dye's criminal conduct by claiming eyewitness knowledge that the informant in fact lacked.

The entire chat between the informant and Captain Magee lasted roughly 20 seconds. *See* Gov't Ex. 4.  Captain Magee testified that the tipster "just wanted to point it out and leave[.]" Def. Ex. 1 at 40 (First Suppression Hr'g Tr. 40:1–2).  Captain Magee then passed the information along to Sergeant Bruce and the two law enforcement officers soon walked over to the bus stop to investigate the tip.  Gov't Ex. 1.  At the bus stop, the two officers found a small crowd that had just exited a bus.  Gov't Ex. 13.  Among them was Mr. Dye, sitting on the bus shelter's bench.  Gov't Ex. 1.  Mr. Dye is a Black man, and he was wearing shorts and a t-shirt and wearing a backpack at the bus stop.  So, he fit the tipster's allegations about the suspect's (1) physical description and (2) location.  But not evident to Sergeant Bruce were the potentially illegal parts of the tipster's tale—the firearm possession and marijuana smoking.  At the April 20, 2021 evidentiary hearing, Sergeant Bruce testified that when he came upon Mr. Dye, he did not see anything in Mr. Dye's hands, see him smoking anything, or see a gun.

The Supreme Court considered similar facts in *Florida v. J.L.*  In that case, the Supreme Court "determined that no reasonable suspicion arose from a bare-bones tip that a young black male in a plaid shirt standing at a bus stop was carrying a gun."  *Navarette*, 572 U.S. at 398 (citing *J.L.*, 529 U.S. at 268).  "The tipster did not explain how he knew about the gun, nor did he suggest that he had any special familiarity with the young man's affairs."  *Id.* (citing *J.L.*, 529 U.S. at 271).  "As a result, police had no basis for believing 'that the tipster ha[d] knowledge of concealed criminal activity.'"  *Id.* (quoting *J.L.*, 529 U.S. at 272).  And "the tip included no predictions of future behavior that could be corroborated to assess the tipster's credibility."  *Id.* (citing *J.L.*, 529 U.S. at 271).  The government argued that "the tip was reliable because its description of the suspect's visible attributes proved accurate" because there "really was a young

black male wearing a plaid shirt at the bus stop." *J.L.*, 529 U.S. at 271.  But the Supreme Court

rejected this argument.  *J.L.* explained:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense:  It will help the police correctly identify the person whom the tipster means to accuse.  Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity.  The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, *not just in its tendency to identify a determinate person*.

*Id.* at 272 (emphasis added).  Ultimately, *J.L.* held, the tip lacked the requisite reliability to

justify the stop and frisk.  *Id.* at 274.

After comparing *J.L.* closely, Mr. Dye's episode appears similar.  In both cases, a

nameless informant tipped off police about a black man in specified clothing carrying a gun at a

bus stop.  His tip, as in *J.L.*, provided police with little more than an "accurate description of a

subject's readily observable location and appearance[.]" *J.L.*, 529 U.S. at 272.  But the tip here

differs from *J.L.* in critical respects.  And those differences keep *J.L.* from controlling or

providing an obvious outcome here.  Specifically, the degree of anonymity surrounding the

tipster differs.  Both Mr. Dye and the government describe the tip at issue here as an

"anonymous tip" and cite corresponding cases.  *See, e.g.*, Doc. at 86 at 4–6; Doc. 87 at 5–6.  But

the tip here was more vulnerable to inspection and follow up than a *truly anonymous* 911 call or

mysterious letter.

Here, the tipster remained anonymous in the sense that he was nameless, but he provided

his tip to police *in person*.  He walked right up to the police station parking lot and offered his tip

to the officer he encountered there.  Gov't Ex. 4.  This face-to-face transmission provided law

enforcement with a chance to evaluate the informant's credibility and demeanor.  The personal

nature of this interaction renders our tipster more reliable than a truly anonymous informant.  *See*

*Donahue*, 948 F.3d at 1189.  And though the tipster didn't provide his own name or contact

information, that isn't necessarily a knock against reliability.  *See United States v. Madrid*, 713

F.3d 1251, 1260 (10th Cir. 2013) (noting that "the 911 operator never asked the caller for his

name or other identifying information and there is no reason to believe he would not have

provided this information if requested"); *see also Gaines*, 2021 WL 2105071, at *6.  Given these

differences, the tipster here was unlike *J.L.*'s "unknown, unaccountable informant[.]"  *J.L.*, 529

U.S. at 271.

Our Circuit recently distinguished *J.L.* on similar grounds in *United States v. Gaines*.

2021 WL 2105071, at *7–9 (affirming district court's conclusion that reasonable suspicion

existed to justify investigatory stop of defendant).  *Gaines* is unpublished and not controlling, but

it extensively analyzed a set of facts that resemble certain elements of Mr. Dye's case.  The court

thus finds the case useful.  *See* 10th Cir. Rule 32.1.  *Gaines* considered whether an unnamed

informant's tip lacking predictive facts was sufficiently reliable to support reasonable suspicion

for an investigatory stop.  *See Gaines*, 2021 WL 2105071, at *5.  The Tenth Circuit

acknowledged that "at first blush, the tip here might seem similar to the tip in *Florida v. J.L.*"

because, in both cases, "the tipster communicated to law enforcement that a person of a certain

description, wearing certain clothing, was at a particular location doing something illegal."  *Id.* at

*7.  Yet our Circuit concluded that the tip in *Gaines* "significantly supports a reasonable-

suspicion finding and that *J.L.* is distinguishable."  *Id.*

The Tenth Circuit explained that "the tip at issue in *Florida v. J.L.*—upon close

inspection—is significantly different from the one" in *Gaines.  Id.* at *8.  *Gaines* identified four

factors that "were not available to support the tipster's credibility in *J.L.*"  *Id.*  Unlike the *J.L.*

informant, the *Gaines* tipster (1) "used the 911 system and was not truly anonymous[;]" (2)

"contemporaneously reported his first-hand observations[;]" (3) "made the tip from a known

location[;]" and (4) "withheld no information, appeared to have a benign motive, and answered all the questions put to him (if he could) over a somewhat lengthy call." *Id.*

Yet *Gaines* emphasizes that the officers' stop of the defendant relied on more than just the informant's tip. "In addition to the tipster's call, evidence of drug-related activity in the area of the [supposed criminal conduct] was a legitimate contributing factor in creating a reasonable suspicion for the investigatory stop." *Id.*; *see also id.* (discussing *Wardlow*, 528 U.S. at 124). *Gaines* reemphasized its two-factor reasoning in its holding: "In conjunction with the anonymous tipster's call, the area's reputation for drug-related activity was a relevant contextual consideration that helped create a reasonable suspicion to stop a particular individual"—the defendant. *Id.* at *9 (citation and internal quotation marks omitted).

Here, the facts fall somewhere between *J.L.* and *Gaines*. On one hand, the facts here present some of the same facts supporting *Gaines*'s effort to distinguish *J.L.* For example, the unnamed tipster made his tip from a known location and thus was not truly anonymous. *See id.* at *8. On the other hand, *Gaines* differs from Mr. Dye's case in several ways.

*First*—and foremost—the facts here do not suggest that police had independent evidence of similar criminal activity in the reported area—one of the things that supported the reasonable suspicion holding in *Gaines*. *See id.* at *8–9. The government does not suggest that police viewed the bus stop where Mr. Dye sat as a known forum for unlawfully possessing firearms or smoking marijuana. More generally, the record lacks evidence of information beyond the scope of the limited tip on which Sergeant Bruce could rely to conclude that reasonable suspicion existed to justify an investigatory stop of Mr. Dye. In contrast, Sergeant Bruce's testimony notes the absence of independent reasons to support a reasonable suspicion finding.

*Second*, the *Gaines* informant's tip enjoyed certain indicia of reliability absent here.  The 911 caller in *Gaines* "contemporaneously reported his first-hand observations." *Id.* at *8. "Indeed, most of the tipster's statements appeared to provide a real-time report of [defendant's] activities[.]" *Id.* at *6.  Notably, the Tenth Circuit found "significantly supportive of the district court's finding" that the tipster "reported that the man in red '*just* made about 20 dollars,' implying that the tipster possessed eyewitness knowledge of an illegal drug sale." *Id.* at *5 (citation omitted); *see also id.* at *5 n.2.  And the *Gaines* informant "withheld no information, appeared to have a benign motive, and answered all the questions put to him (if he could) over a somewhat lengthy call." *Id.* at *8.  Here, the informant did not contemporaneously report his observations of unlawful conduct.  Instead, he reported someone else's earlier observations (and perhaps falsely claimed eyewitness knowledge).  Either way, the facts differ from *Gaines*.  The informant here lodged the tip not long after his conversation with the bus driver, but he did not provide the same sort of *real-time* eyewitness reporting of criminal conduct featured in *Gaines*. The informant did not refuse to answer questions, but his conversation with Captain Magee was brief.  It lasted about 20 seconds. *See* Gov't Ex. 4.  And the informant apparently wanted it that way.  Captain Magee testified that the tipster "just wanted to point it out and leave." Def. Ex. 1 at 40 (40:1–2) (First Suppression Hr'g Tr.).  Captain Magee testified that the informant himself did not describe the suspect in much detail, but rather confirmed Captain Magee's own description of a person at the bus stop visible from the officer's vantage point. *See* Def. Ex. 1 at 28–29.  At bottom, the tipster's exchange of information here was far less dynamic, detailed, and contemporaneous than the 911 call in *Gaines*.

So, the informant's tip carried *some* indicia of reliability.  But, did the totality of the circumstances sustain a finding of reasonable suspicion?  Neither *J.L.* nor *Gaines* provides a

clear answer.  The government directs the court to the Supreme Court's *Navarette* decision for additional guidance.  *See* Doc. 86 at 7–9.  *Navarette* held in a "close case" that indicia of reliability surrounding an anonymous 911 call were sufficient to provide the officer with reasonable suspicion that the driver of the reported vehicle had run another vehicle off the road.  *Navarette*, 572 U.S. at 404 (citation and internal quotation marks omitted).  *Navarette* identified three indicia of reliability:  "(1) 'claimed eyewitness knowledge of' the illegal activity, (2) a contemporaneous report—'soon after'—the occurrence of the activity, and (3) the 'use [of] the 911 emergency system.'"  *Gaines*, 2021 WL 2105071, at *5 (quoting *Navarette*, 572 U.S. at 399–400).  The government emphasizes the third factor, highlighting the informant's willingness to both (1) talk to a police officer in person and (2) talk to the police within eyeshot of the bus station where the suspect sat.  *See* Doc. 86 at 8–9.  The court agrees.  The face-to-face reporting warrants an indicium of credibility under *Navarette*'s reasoning.  *See Navarette*, 572 U.S. at 400–401.[2]  The government correctly notes that this willing engagement with police as an identifiable person signals credibility here, too.

But the informant's tip differs from *Navarette*'s 911 call claiming eyewitness knowledge.  *Navarette* noted that eyewitness knowledge "lends significant support to the tip's reliability."  *Id.* at 399.  And the Supreme Court reasoned that the 911 caller "necessarily claimed eyewitness knowledge of the alleged dangerous driving" because a "driver's claim that another vehicle ran her off the road . . . necessarily implies that the informant knows the other car was driven

---

[2]     And perhaps talking to the police surreptitiously within sight of the bus station signals a bit of reliability.  *See* Def. Ex. 1 at 28–29, 39–40 (First Suppression H'rg Tr) (describing informant's interaction with Captain Magee); *see also* Gov't Ex. 4.  Though, given the distance between the two locations and Mr. Dye's position facing the opposite direction, and the informant's brief and subtle identification of the suspect, there's little reason to think Captain Magee believed the suspect had any idea that the informant (1) even existed—let alone (2) saw Mr. Dye at the bus station, or (3) spoke to the police about Mr. Dye.  *See* Gov't Ex. 4.

dangerously." *Id.  Navarette* distinguished *J.L.* on this point, noting that the necessarily implied claim of eyewitness knowledge is "in contrast to" *J.L.*, "where the tip provided no basis for concluding that the tipster had actually seen the gun." *Id.* (citing *J.L.*, 529 U.S. at 271).

Here, the government explains that the informant reported someone else's observations. And even if the informant misled Captain Magee by claiming falsely that he had seen the gun on Mr. Dye, that claim arrived with few accompanying logical inferences or details to accredit it. The nature of the conduct alleged by the informant here doesn't necessarily imply eyewitness or otherwise first-hand information.  Unlike running another driver off the road in *Navarette*, one can smoke marijuana and possess a firearm without conscious involvement of another.  The tip alleging a man at the bus stop was smoking pot and possessing a gun *could* imply the informant had witnessed those criminal activities, but that implication is not a *logical necessity*. *Cf. Navarette*, 572 U.S. at 399.  After all, it turns out that the informant likely lacked any first-hand information about the gun.

This tip's content offered fewer details about the criminal conduct than *Navarette*'s 911 call.  *Navaratte* derived an indicum of reliability from the caller reporting "more than a conclusory allegation of drunk or reckless driving." *Id.* at 403.  The Supreme Court explained that the caller instead had "alleged a specific and dangerous result of the driver's conduct: running another car off the highway." *Id.*  Here, the informant offered no specifics about the unlawful conduct.  He reported only conclusory allegations of smoking marijuana and possessing a gun.

Finally, Mr. Dye's facts differ from *Navarette* because the informant here didn't make a contemporaneous tip like the *Navarette* 911 call.  In *Navarette*, the "timeline of events suggests that the caller reported the incident soon after she was run off the road" and the Supreme Court

noted this "sort of contemporaneous report has long been treated as especially reliable." *Id.* at 399. *Navarette* explained that there was "no indication that the tip in [*J.L.*] (or even in *White*) was contemporaneous with the observation of criminal activity or made under the stress of excitement caused by a startling event, but those considerations weigh in favor of the caller's veracity here." *Id.* at 400. Here, it's not clear that the informant personally observed or otherwise perceived any criminal activity. But even if he did, the informant communicated with police only after casually chatting with the bus driver, leaving the bus station, and walking across the street to the police station. *See* Def. Ex. 5. Nothing suggests that the informant here spoke to Captain Magee "under the stress of excitement caused by a startling event[.]" *Navarette*, 572 U.S. at 400.

The court must weigh the totality of the circumstances and information available to the officers. It remains noteworthy that officers had little understanding of the tipster's basis for knowing of *the illegality* he alleged. The tipster either did not purport to provide information based on his eyewitness knowledge of illegal activity, or simply claimed eyewitness knowledge without buttressing that claim with any specifics. Other than the tipster's willingness to talk to an officer for about 20 seconds in a police station parking lot across from the bus station and his subtlety while talking about the suspect's location, Captain Magee and Sergeant Bruce had little reason to merit the credibility of this nameless informant, or the veracity of his claims. The tipster's conversation with Captain Magee was abbreviated and lacked detail about either the suspect's criminal activity or the tipster's basis for knowledge of that criminal activity—other than that he apparently had observed it. As in *J.L.*, the tipster did not "suggest that he had any special familiarity with the young man's affairs." *Navarette*, 572 U.S. at 398 (citing *J.L.*, 529

U.S. at 271). And at no point did Captain Magee observe the tipster anywhere near Mr. Dye. Def. Ex. 1 at 43–44 (First Suppression Hr'g Tr. 43:23–44:2).

Moreover, Sergeant Bruce testified at the April 20, 2021 evidentiary hearing that when he walked over to the bus station to investigate, he did not verify independently the reliability of the tip beyond what he could see—the suspect's appearance and location (much of which was already visible and known to Captain Magee from the police station parking lot when he received the tip). Despite the suspect allegedly smoking marijuana, Sergeant Bruce reported nothing about smelling marijuana as he approached Mr. Dye, and testified that he couldn't recall smelling the odor of marijuana. With no scent of marijuana in the air, the "'commonsense judgments'" that the reasonable suspicion determination requires can suggest that there was no pot smoking afoot or about to commence as Sergeant Bruce approached Mr. Dye. *See Donahue*, 948 F.3d at 1188 (quoting *Wardlow*, 528 U.S. at 125).

In sum, Sergeant Bruce has sparse reason to believe that the tipster had knowledge of concealed criminal activity. "Although no single factor is dispositive," *Chavez*, 660 F.3d at 1222, the law governing reasonable suspicion based on an informant's tip values an informant's claim of contemporaneous eyewitness knowledge, *see Donahue*, 948 F.3d at 1189. And an informant's claim of eyewitness knowledge is present in the record here, albeit clouded heavily by uncertainty from the both the record and briefing. Even if the informant told Captain Magee that he had seen the gun himself, little about the tipster's short interaction with Captain Magee backed up this naked claim of eyewitness knowledge. The informant's brief in-person tip to a policeman within sight of the bus station enjoyed some indicia of reliability, but lacked detail about the criminal conduct, lacked specifics of what else the informant had seen, and lacked meaningful predictive information.

When Sergeant Bruce walked up to Mr. Dye sitting in the bus shelter, he had corroborated almost none of the information that the unnamed (but not truly anonymous) informant had provided in his undetailed, 20-second exchange with another officer.  He spotted no firearm and neither saw nor smelled marijuana that supposedly was being smoked.  He asked no questions of bystanders or Mr. Dye before seizing him.  Nothing confirmed or supported the content of the informant's tip.  Sergeant Bruce confirmed only the physical appearance and location of the man supposedly engaged in criminal conduct.  And most of that information was hardly predictive—it was already known to law enforcement at the time of the tip.  *See* Def. Ex. 1 at 28–29 (explaining that informant did not describe the suspect in detail, but rather confirmed Captain Magee's own description of a person at the bus stop); *see also* Gov't Ex. 4 (showing Mr. Dye was visible to Captain Magee as he received informant's tip).  And the record does not suggest the seizing officer had independent knowledge of recent similar criminal activity at the reported location.  These factors limited the tip's reliability and offered no independent support for finding reasonable suspicion.

This case presents an odd set of facts that makes for something of a close call.  But the totality of the circumstances and information available to Sergeant Bruce left him without articulable facts to support reasonable suspicion that criminal activity might be afoot.  Lacking reasonable suspicion, the court concludes that Sergeant Bruce's seizure of Mr. Dye was unreasonable for purposes of the Fourth Amendment—and thus unconstitutional.  Because Mr. Dye sustained an unconstitutional seizure seconds before law enforcement discovered the evidence at issue here, the court need not determine whether Mr. Dye sustained a second unconstitutional seizure at the hands of Captain Magee during the intervening moments.

26

The court thus turns to consider whether Sergeant Bruce's unreasonable seizure renders inadmissible the evidence that he recovered soon after the seizure.

### B.     Whether Evidence Seized After Sergeant Bruce's Seizure of Mr. Dye Triggers the Exclusionary Rule

Mr. Dye invokes the exclusionary rule and moves the court to suppress the evidence surrounding seizure of the firearm recovered during his flight from the officers at the bus stop. Doc. 78 at 1.  The court reviews briefly the exclusionary rule and the legal principles governing motions invoking it to suppress evidence.

### 1.  Law Governing Motions to Supress Evidence

"The exclusionary rule is not a constitutional right but a prudential doctrine that the Supreme Court has created to compel respect for Fourth Amendment guarantees." *United States v. Shrum*, 908 F.3d 1219, 1233 (10th Cir. 2018).  "It is a judicially created sanction specifically designed as a windfall remedy to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 248 (2011) (citations and internal quotation marks omitted).  "'The fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies.'" *Shrum*, 908 F.3d at 1233 (quoting *Herring v. United States*, 555 U.S. 135, 140 (2009)).

When invoking the exclusionary rule, a "defendant has the initial burden of establishing a causal connection between an illegal seizure and the evidence he seeks to suppress." *Id.*  The "defendant must establish the incriminating evidence 'would not have come to light *but for* the illegal [seizure].'"  *Id.* (quoting *Wong Sun*, 371 U.S. at 488 (emphasis added)).  If defendant establishes *but for* causation, "the relevant inquiry becomes whether the Government has proven the incriminating evidence was discovered by means sufficiently distinguishable from the initial illegality to be purged of the primary taint."  *Id.*

### 2.   Whether the Exclusionary Rule Applies to Evidence Seized After Sergeant Bruce's Seizure of Mr. Dye

Here, Mr. Dye's motion seeks to supress all "physical evidence seized, observations made, and any tangible or intangible evidence later derived from the June 12, 2018, seizure of Mr. Dye's person by the Kansas City, Kansas police department" including "the Glock .40 caliber gun, serial #BCXS419, recovered during the foot pursuit of Mr. Dye."  Doc. 78 at 1.  Mr. Dye reasons that the court must supress this evidence because "all evidence seized, observed, or derived from the" seizure of Mr. Dye on June 12, 2018 "is the fruit of illegal, unconstitutional seizure of his person[.]"  *Id.*; *see also id.* at 2 (¶¶ 1–2) (citing *Wong Sun*, 371 U.S. at 471).

The government opposes suppressing this evidence for two primary reasons.  *First*, the government argues that the "defendant ha[d] not been seized when the gun fell from his person, and thus the gun can be used as evidence against him."  Doc. 86 at 11.  And *second*, the officers had no need to secure a warrant before seizing the gun at the bus stop because Mr. Dye had abandoned the weapon.  *Id.* at 13.  The court now considers the relationship between the Fourth Amendment violation and the evidence that followed, and then evaluates the government's two reasons against suppressing the evidence.

Mr. Dye asserts that Sergeant Bruce's unlawful seizure of Mr. Dye led law enforcement to discover the gun recovered during the foot pursuit of Mr. Dye.  Doc. 78 at 1–2; Doc. 87 at 23.  The seizure induced Mr. Dye to clamor to escape.  After colliding with Captain Magee and his swinging baton, Mr. Dye dashed away as a gun fell from his person.  Mr. Dye has established that the incriminating evidence would not have come to light but for the illegal seizure seconds earlier.  The court thus asks whether the government has demonstrated that police discovered the gun "by means sufficiently distinguishable from the initial illegality to be purged of the primary

taint." *Shrum*, 908 F.3d at 1233.  The government's brief does not address this question directly. Instead, the government offers two reasons why nothing tainted the evidence in the first place.

*First*, the government argues that Mr. Dye's encounter with Sergeant Bruce and Captain Magee presents no Fourth Amendment violation justifying suppression.  Doc. 86 at 11.  This argument is unpersuasive.  The Fourth Amendment enshrines the right to be free from unreasonable seizures.  Contrary to the government's assertion, Mr. Dye had been seized seconds before the gun fell from wherever it was hidden on Mr. Dye.  For reasons explained above, Sergeant Bruce briefly seized Mr. Dye by his show of authority as Mr. Dye sat at the bus stop, and that seizure was unreasonable under all the circumstances.  This unreasonable seizure violated Mr. Dye's Fourth Amendment rights.

*Second*, the government asserts that Mr. Dye abandoning the firearm makes it fair game as evidence at trial.  Doc. 86 at 13.  This reasoning also fails to persuade the court to deny Mr. Dye's motion.  "The Fourth Amendment is not implicated when police search property that has been abandoned."  *United States v. Easley*, 911 F.3d 1074, 1083 (10th Cir. 2018).  "Property is considered abandoned if the owner lacks an objectively reasonable expectation of privacy." *United States v. Juszczyk*, 844 F.3d 1213, 1214 (10th Cir. 2017).  "Abandonment contains subjective and objective components."  *Id.*  But our Circuit has explained that the "owner's abandonment must be voluntary, and abandonment cannot be voluntary when it results from a violation of the Fourth Amendment."  *Easley*, 911 F.3d at 1083.

Here, Mr. Dye dropped the firearm in the short seconds following Sergeant Bruce seizing him.  The gun fell to the ground during the chaotic scramble that the Fourth Amendment violation immediately precipitated.  Mr. Dye may have abandoned the weapon.  *See United States v. Jackson*, 806 F. App'x 645, 648 (10th Cir. 2020) (holding that absent a preceding

Fourth Amendment violation, defendant's "decision to continue fleeing from the police amounts to voluntary abandonment" of a firearm that had fallen to the street during scuffle with law enforcement where the falling firearm made a metallic sound, was visible on the street, and induced someone to yell "gun"). But here, Mr. Dye's abandonment resulted from a Fourth Amendment violation. The abandonment thus was not voluntary. *See Easley*, 911 F.3d at 1083. So, the firearm lacks the "voluntarily abandoned" status that could empower a law enforcement officer to seize evidence absent a warrant without offending the Fourth Amendment. The court rejects the government's assertion that the firearm's abandonment renders it admissible.

In sum, the government's arguments fail to show that the gun evidence here either (1) suffered from no primary taint of a precipitating Fourth Amendment violation, or (2) was purged of the primary taint. The exclusionary rule advises supressing the evidentiary fruit poisoned by Mr. Dye's unlawful seizure.

## V.     Conclusion

Mr. Dye moves to supress evidence of the firearm discovered during his encounter with police at a Kansas City, Kansas bus stop on June 12, 2018. During this encounter, Sergeant Bruce unreasonably seized Mr. Dye by a show of authority without reasonable suspicion. This unreasonable seizure violated Mr. Dye's Fourth Amendment rights and caused law enforcement to discover incriminating evidence moments later. Mr. Dye's arguments overcome the government's objections to suppressing the evidentiary fruits of the seizure. The court thus grants Mr. Dye's request to suppress that evidence.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Mr. Dye's Renewed Motion to Suppress Evidence (Doc. 78) is granted.

**IT IS SO ORDERED.**

**Dated this 18th day of June, 2021, at Kansas City, Kansas.**

                                    s/ Daniel D. Crabtree
                                    **Daniel D. Crabtree**
                                    **United States District Judge**